**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
UNITED STATES OF AMERICA,

                Plaintiff,

          -against-

THE REAL PROPERTY LOCATED AT 272
OLD MONTAUK HIGHWAY, MONTAUK,
NEW YORK, 11954, AND ALL PROCEEDS
TRACEABLE THERETO,

ANY AND ALL SHARES OF 93 OLD
MONTAUK OWNERS, INC. HELD IN THE
NAME OF DISTINCTIVE VENTURES, LLC,
AND ALL PROCEEDS TRACEABLE
THERETO,

ANY AND ALL SHARES OF 93 OLD
MONTAUK OWNERS, INC. HELD IN THE
NAME OF BRIAN CALLAHAN AND SHERI
CALLAHAN, TOGETHER WITH THE
PROPRIETARY LEASE FOR COOPERATIVE
UNIT SALT SEA #4 AT THE REAL
PROPERTY LOCATED AT 272 OLD
MONTAUK HIGHWAY, MONTAUK, NEW
YORK, 11954, AND ALL PROCEEDS
TRACEABLE THERETO, AND

THE REAL PROPERTY LOCATED AT 47
**CLOCK** TOWER LANE, OLD WESTBURY,
NEW YORK 11568, AND ALL PROCEEDS
TRACEABLE THERETO,

Defendants <u>In Rem</u>.
-----------------------------------------------------------X

**MEMORANDUM OF**
**DECISION AND ORDER**
12-CV-1880 (ADS)(GRB)

<u>**APPEARANCES:**</u>

**United States Attorney's Office**
*Attorneys for the Plaintiff*
271 Cadman Plaza East, 7th Floor
Brooklyn, NY 11201
    By:  Brian D. Morris, AUSA

Laura D. Mantell, AUSA
Karin K. Orenstein, AUSA

**K & L Gates LLP**
*Attorneys for the Claimant CreXus S. Holdings, LLC*
599 Lexington Avenue
New York, NY 10022
    By:  Alyssa B. Cohen, Esq.
           John H. Culver, Esq.
           Joanna A. Diakos, Esq., of Counsel

**Morrison Cohen LLP**
*Attorneys for the Claimant Gibraltar Private Bank and Trust*
909 Third Avenue
New York, NY 10022
    By:  Evan Scott Lupion, Esq.
           Yehuda David Scharf, Esq., of Counsel

**Law Offices of Andrew J. Frisch**
*Attorneys for the Claimants Distinctive Ventures, LLC, and Distinctive Investments LLC*
40 Fulton Street, 23rd Floor
New York, NY 10038
    By:  Andrew J. Frisch, Esq., of Counsel

**SherTremonte LLP**
*Attorneys for the Claimant Sheri Manson-Callahan*
41 Madison Avenue, 41st Floor
New York, NY 10010
    By:  Michael Tremonte, Esq., of Counsel

**Park & Jensen LLP**
*Attorneys for the Claimant Sheri Manson-Callahan*
630 Third Avenue
New York, NY 10017
    By:  Robert Knuts, Esq., of Counsel

**Greenberg Traurig LLP**
*Attorneys for the Claimant OneWest Bank, F.S.B.*
MetLife Building
200 Park Avenue
New York, NY 10166
    By:  Eric Nevins Whitney, Esq.
           Rachel Lois Izower-Fadde, Esq.
           Steven M. Nadel, Esq., of Counsel

**Farrell Fritz, P.C.**
*Attorneys for the Claimants Peter v. Pantaleo and Denise L. Loring*
1320 Rxr Plaza
Uniondale, NY 11556
    By:   Kevin Patrick Mulry, Esq., of Counsel

**KattenMuchinRosenman LLP**
*Attorneys for the Claimant Latus Partners LLC*
575 Madison Avenue
New York, NY 10022
    By:  Michael Max Rosensaft, Esq., of Counsel

**SPATT, District Judge.**

On April 17, 2012, the Plaintiff United States of America (the "Government")

commenced this civil <u>in rem</u> action seeking forfeiture of (1) the real property located at 272 Old

Montauk Highway, Montauk New York (the "Montauk Property"); (2) any and all shares of 93

Old Montauk Owners, Inc. (the "Co-Op") held in the name of Distinctive Ventures, LLC (the

"Distinctive Shares"); (3) any and all shares of the Co-Op held in the name of Brian Callahan

("Callahan") and Sheri Manson-Callahan ("Manson-Callahan"), together with the proprietary

lease for cooperative unit Salt Sea #4 at the Montauk Property (the "Callahan Shares" and,

together with the Distinctive Shares, the "Defendant Shares"); and (4) the real property located at

47 Clock Tower Lane, Old Westbury, New York (the "Old Westbury Property" and, together

with the Montauk Property, the "Defendant Properties").

Since the filing of this civil forfeiture proceeding, the following Claimants have

appeared: CreXus S. Holdings, LLC ("CreXus"); Gibraltar Private Bank And Trust

("Gibraltar"); Manson-Callahan; OneWest Bank, F.S.B. ("OneWest"); Denise L. Loring

("Loring"); Peter V. Pantaleo ("Pantaleo"); Distinctive Ventures, LLC ("Distinctive Ventures")

and Distinctive Investments, LLC ("Distinctive Investments"). On January 18, 2013, the Court

(Wexler, J.) granted the Government's motion to stay this action due to the pendency of a related

criminal investigation, discussed below. All the Claimants consented to the Government's motion.

Presently before the Court is a motion by the Government, dated May 16, 2013, for an interlocutory sale of the Defendant Properties. The Government makes this motion pursuant to 18 U.S.C. § 981(g)(6) and Rule G(7) of the Supplemental Rules of Certain Admiralty and Maritime Claims and Asset Forfeiture Actions (the "Supplemental Rules"). CreXus and OneWest submitted responses supporting the Government's motion. However, Distinctive Ventures and Distinctive Investments (collectively, "Distinctive") opposed the Government's motion with respect to the Montauk Property, while Manson-Callahan opposed the motion with respect to the Old Westbury Property. Also before the Court is a December 26, 2013 letter motion by Latus Partners, LLC ("Latus"), seeking to intervene in this civil forfeiture action and opposing the Government's motion.

Thereafter, on January 23, 2014, this Court (Spatt, J.) so ordered a stipulation and order by which the Government agreed to withdraw the motion for the interlocutory sale of the Old Westbury Property so that a proposed sale of the Old Westbury Property could proceed with the consent of Manson-Callahan and OneWest. The January 23, 2014 Order resolved OneWest's claims. As such, the only alleged forfeitable property currently at issue in the Government's pending motion for an interlocutory sale is the Montauk Property.

For the reasons that follow, the Court grants in part and denies in part the Government's motion. The Court also denies Latus's letter motion to intervene.

# I. BACKGROUND

## A. The Circumstances Leading to the Commencement of this Civil Forfeiture Action

This civil forfeiture proceeding was commenced by the Government for the purpose of forfeiting and condemning to the use of the Government the Defendant Properties and the Defendant Shares on the grounds that (1) the Defendant Properties and the Defendant Shares were allegedly constituted of and/or derived from the proceeds of securities fraud and (2) the Defendant Properties and the Defendant Shares were allegedly constituted of and/or derived from proceeds involved in money laundering activity.

In this regard, according to the Government, Callahan engaged in a fraudulent scheme involving several investment funds that he controlled (the "Callahan Funds").  The Government alleges that Callahan diverted investor funds from the Callahan Funds to the real estate project of his brother-in-law, Adam Manson ("Manson").  This real estate project was known as the Panoramic View Oceanfront Resort ("Panoramic View") and was located on the Montauk Property.  The Government further alleges that Callahan (1) made material misrepresentations to investors in the Callahan Funds, including as to the liquidity of the Callahan Funds' investments in the Panoramic View project and (2) used money from new and existing investors to pay off investors in other Callahan Funds.

In relevant part, the Government claims that (1)  $12.1 million of funds invested by investors in the Callahan Funds were used to acquire the Defendant Shares; (2) $17 million of funds invested by investors in the Callahan Funds were directed towards the payment of loans used to secure the Montauk Property and the Defendant Shares; and (3) $450,000 of funds invested by investors in the Callahan Funds were used as a down-payment toward the acquisition of the Callahan Shares.  Apparently, these payments were made through the transfer of monies

from one or more accounts without any clear business purpose, in a manner that is consistent with money laundering.

Of note, these securities fraud and money laundering allegations are the subject of both a criminal action that has been brought against Callahan and Manson, entitled <u>United States v. Callahan, et al.</u>, Case No. 13-CR-453 (E.D.N.Y.), as well as a civil action entitled <u>Securities and Exchange Commission ("SEC") v. Callahan, et al.</u>, Case No.12-CV-1065 (E.D.N.Y.). Further, in connection with the <u>SEC v. Callahan, et al.</u> case, the nearly $30 million of funds invested by investors in the Callahan Funds that were diverted to the Panoramic View project are now in receivership.

## B. The Purchase of the Montauk Property and the CreXus Loan

Pursuing his Panoramic View real estate project, in early 2007, through Distinctive, Manson purchased the Montauk Property, which is a ten-acre area of land that overlooks one thousand feet of beach and the Atlantic Ocean and contains both luxury apartments and a hotel. The Montauk Property is a cooperative corporation. Therefore, in order to make the purchase, Distinctive had to purchase all of the shares of the Co-Op, which holds title to the Montauk Property. As discussed above, Manson and Distinctive Ventures relied in part on funds invested by investors in the Callahan Funds to support the purchase of the Panoramic View project.

On January 5, 2007, in addition to these funds, for the purpose of purchasing and renovating the Montauk Property, Distinctive Ventures executed a Loan Agreement with Barclays Capital Real Estates Inc. ("Barclays"). Pursuant to this Loan Agreement, Barclays provided Distinctive Ventures with a $35 million acquisition loan and a $10 million construction loan, for a total loan amount of $45 million (the "CreXus Loan"). The CreXus Loan was secured by (1) a mortgage on the Montauk Property and (2) a lien on the Distinctive Shares and related

proprietary leases.  Subsequently, in early 2008, Barclays released the mortgage on the real property, leaving the remaining loan amount secured only by a lien on the 8,955 Distinctive Shares and related proprietary leases for the unsold apartment units located at the Montauk Property.  On April 8, 2011, Barclays assigned all of its rights, title and interest in the CreXus Loan to CreXus.

However, since approximately July 5, 2012, Distinctive Ventures has been in default on repaying the CreXus Loan.  As such, as of April 1, 2013, the total amount due and owing on the CreXus Loan obligation was $14,598,467.92, which is comprised of (1) $12,973,469 for the principal amount; (2) $929,015.70 for the past due contractual interest; (3) $135,846.64 for the current contractual interest; (4) $493,712.57 for the default interest; and (3) $66,424.01 for the late charges.  The interest on the CreXus Loan continues to accrue at a rate of 17.16 percent per annum or $6,184.02 per day, which includes (1) contractual interest at a rate of 12.16% per annum or $4,382.15 and (2) default interest at a rate of 5% per annum or $1,801.87 per day.  In addition, late charges in the amount of 5% of the unpaid amounts due and owing accrue with each payment Distinctive Ventures fails to make.

Distinctive Ventures concedes it is in default but blames this default on the 2008 housing crisis and collapse of the financial markets, as well as the Government's initiation of this lawsuit.  In this regard, Distinctive Ventures has struggled to sell all of the luxury apartments located on the Montauk Property.  The Distinctive Claimants claim that, without the additional proceeds from selling these units, twelve of which remain, Distinctive Ventures was unable to continue making payments on the CreXus Loan and, therefore, defaulted in July of 2012.

Nevertheless, despite the default on the CreXus Loan, the Distinctive Claimants point out that the Montauk Property is well-maintained and that its hotel remains fully operational.

Concerning the latter contention, apparently, from the hotel's cash flow, Distinctive Ventures has consistently paid for maintenance repairs, staff salaries, real-estate taxes, property insurance and utilities. Allegedly, as a result, Distinctive Ventures has generated a surplus in recent years, but offers no explanation as to why it has not used any of this surplus revenue toward repaying its obligation on the CreXus Loan.

## C. The Gibraltar Loan

Gibraltar asserts that on March 21, 2011, it executed a loan agreement (the "Gibraltar Loan Agreement") and accompanying promissory note (the "Gibraltar Note"), with Callahan and Manson-Callahan. Under the Gibraltar Loan Agreement and the Gibraltar Note, Callahan and Manson-Callahan are obligated to repay Gibraltar the principal amount of $2,278,000 with interest (the "Gibraltar Loan"). The Gibraltar Loan was secured by the Callahan Shares and a related proprietary lease for Salt Sea Apartment No. 4, which is one of the luxury apartments located on the Montauk Property.

## D. The Value of and Interest in the Montauk Property

On June 7, 2012, KTR Real Estate Advisors ("KTR") appraised the Montauk Property as between $52 million and $88 million (the "2012 KTR Appraisal"). The 2012 KTR Appraisal considered both the hotel and the luxury residential cooperative apartments located on the Montauk Property, as well as the pending SEC investigation, and was based on the pricing, quality, location and marketability of the Montauk Property.

On August 6, 2012, HFZ Capital and BSG Real Estate Group ("HFZ-BSG") submitted a Letter of Intent (the "August 2012 LOI") to Manson stating a $50 million all-cash offer and a $55 million offer involving seller financing secured by the unsold cooperative shares. Manson

rejected the 2012 LOI, allegedly because it was offering an amount significantly below what he believed to be the value of the property.

About seven months after the 2012 KTR Appraisal, in a letter dated January 7, 2013 (the "2013 SIR Letter"), the Vice President/Brokerage Manager for Sotheby's International Realty, Inc. ("SIR"), John M. Gickling ("Gickling"), estimated that the Montauk Property, including the hotel and the remaining twelve apartment units, were worth a market value of $75 to $80 million, even in light of this civil forfeiture proceeding and the negative publicity. The 2013 SIR Letter recommended listing the Montauk Property at $88 million.

Also in January of 2013, Manson sent the Receiver in the <u>SEC v. Callahan, et al.</u> case a Letter of Intent, dated January 29, 2013 (the "January 2013 LOI"). The January 2013 LOI proposed that one of Manson's other companies, Distinctive Management, LLC ("Distinctive Management"), purchase the Montauk Property for $56.2 million (the "January 2013 LOI"). According to the Distinctive Claimants, the $56.2 million purchase price would be divided as follows: (1) $14 million to repay the CreXus Loan; (2) $2.2 million to repay the Gibraltar Loan; and (3) $40 million to repay the investors in the Callahan Funds. However, the Receiver rejected the January 2013 LOI, because (1) the $56.2 million would result in only $40 million to repay the investors in the Callahan Funds; (2) Distinctive Management's proposal failed to specify its financing; and (3) it included a ninety-day due diligence period.

**E. Procedural History**

As stated above, on April 17, 2012, the Government commenced this civil forfeiture action. Thereafter, on May 30, 2012, CreXus filed a claim, which was amended on August 20, 2012, as a lienholder against the Distinctive Shares. On June 11, 2012, on behalf of Distinctive, Manson filed claims in this action asserting ownership interests in the Montauk Property and the

Distinctive Shares.  One day later, on June 12, 2012, Gibraltar filed a claim as a lienholder against the Callahan Shares.

Between July 17, 2012 and November 30, 2012, the Distinctive, CreXus and Gibraltar Claimants filed answers to the Government's Verified Complaint.  Thereafter, on January 17, 2013, Loring filed a claim asserting an interest in the Montauk Property as the lessee under a proprietary lease to Salt Sea Apartment No. 7, another one of the luxury apartments located at the Montauk Property.  That same day, with the consent of all Claimants, the Government moved to stay this civil forfeiture proceeding due to the pending criminal investigation.  The following day, January 18, 2013, the Court (Wexler, J.) granted the Government's motion.

About two months later, on March 25, 2013, the Government entered into a non-binding Letter of Intent with HFZ-BSG (the "March 2013 LOI").  In the March 2013 LOI, HFZ-BSG expressed its intention to purchase the Montauk Property through the acquisition of the Distinctive Shares for the price of $54,150,000.  Further, according to the March 2013 LOI, the closing would occur after the Court approves a contract for an interlocutory sale, subject to the procedures set forth in 28 U.S.C. § 2001, et seq., and Supplemental Rule G(7).

In addition, the March 2013 LOI provides that HFZ-BGS is entitled to a forty-five day due diligence period, as well as one extension of the due diligence period for fifteen business days upon the submission of a $500,000 payment, which would be applicable to the purchase price of the Montauk Property at closing.  The March 2013 LOI also includes (1) a "breakup fee" provision, under which HFZ-BSG would receive $3 million and its broker, SIR, would receive $1 million in the event that another bidder other than HFZ-BSG goes to closing for the purchase of the Montauk Property in excess of 110% or more of HFZ-BSG's bid; and (2) a "broker's commission" provision under which SIR is entitled to receive a real estate commission of 2% of

the purchase price from the proceeds of the sale at closing, which would be $1,083,000 based on HFZ-BSG's offer.

Accordingly, on May 16, 2013, the Government submitted the present motion seeking the Court's approval of an interlocutory sale of the Montauk Property. The Government also asks the Court to order Distinctive, the Co-Op and Manson to (1) produce monthly accounting of revenue and expenses associated with the Montauk Property, together with copies of the business and financial records concerning the Distinctive Shares and the Montauk Property; and (2) until the Montauk Property is sold, deposit any excess income, including but not limited to amounts due on the CreXus Loan and the Gibraltar Loan, with the United States Marshals Service to be held in the Seized Asset Deposit Fund pending further order of the Court.

Following the Government's motion, on June 5, 2013, 40 North Properties LLC ("40 North") extended an offer to Manson with respect to the Montauk Property. As part of the offer, 40 North agreed to buy out the loans associated with the Callahan Funds for $38 million in cash, as well as to purchase the CreXus Loan and the Gibraltar Loan for an unspecified amount. The 40 North offer includes a guaranteed closing and eliminates the $4 million breakup fee and 2% broker's commission found in the March 2013 LOI.

Thereafter, on June 7, 2013, this civil forfeiture proceeding was reassigned to this Court from the Honorable United States District Judge Leonard D. Wexler. In this regard, the instant action was reassigned because it was related to the previously-filed SEC v. Callahan, et al. case that was already pending before this Court.

On June 26, 2013, the Government's motion was fully briefed. However, months later, on December 26, 2013, Latus filed a letter motion to intervene and oppose the Government's motion for interlocutory sale of the Montauk Property to HFZ-BSG. In this regard, Latus, in

cooperation with Distinctive Ventures, has submitted its own offer to purchase the Montauk

Property (the "Latus Offer"). According to the Latus Offer, Latus would (1) purchase with cash

the notes currently held by the SEC receiver for $42 million, which could then be used in this

civil forfeiture proceeding to ensure restitution is paid to any potential victims and that any

alleged illegal proceeds for criminal acts are forfeited and (2) Distinctive Ventures would pay off

the CreXus Loan and the Gibraltar Loan, which at the time of the Government's motion was

approximately $15 million.

## II. DISCUSSION

### A.  Legal Standard under Supplemental Rule G(7) and 18 U.S.C. § 981(b)(6)

Pursuant to Rule G of the Supplemental Rules "[w]hen the government does not have

actual possession of the defendant property the court . . . may enter any order necessary to

preserve the property, to prevent its removal or encumbrance, or to prevent its use in a criminal

offense." United States v. All Right, Title & Interest in Prop., Appurtenances, & Improvements

Known as 479 Tamarind Drive, Hallendale, Fla., 98 CIV. 2279 DLC, 2012 WL 3886698, at *2

(S.D.N.Y. Sept. 7, 2012) (quoting Supp. R. G(7)(a)) (ellipse in original) (hereinafter "Tamarind

Drive"); see also United States v. Peterson, 04 CR. 752 (DC), 2010 WL 2331990, at *2

(S.D.N.Y. June 9, 2010) ("In addition, Federal Rule of Criminal Procedure 32.2(b)(7) provides

that '[a]t any time before entry of a final forfeiture order, the court, in accordance with

Supplemental Rule G(7) of the Federal Rules of Civil Procedure, may order the interlocutory

sale of property alleged to be forfeitable.'") (quoting Fed. R. Crim. 32.2(b)(7)) (brackets in

original).  In this regard, the Supplemental Rules provide that "the court may order all or part of

the property sold if . . . the property is subject to a mortgage or to taxes on which the owner is in

default [ ] or [ ] the court finds other good cause." United States v. Maye, 08-CR-00194-WMS-

JJM, 2011 WL 2533020, at *1 (W.D.N.Y. June 24, 2011) (quoting Supp. R. G(7)(b)(i)(C) and (D)).

Nevertheless, the Court notes that 18 U.S.C. § 981(g)(6) "governs situations . . . where a civil forfeiture proceeding is stayed in light of a related criminal investigation and prosecution" and provides that "a district court 'shall enter any order necessary to preserve the value of the property or to protect the rights of lienholders or other persons with an interest in the property while the stay is in effect.'" United States v. Real Prop. & Residence located at 4816 Chaffey Lane, 699 F.3d 956, 961 (6th Cir. 2012) (quoting 18 U.S.C. § 981(g)(6)). Thus, while "Rule G(7) [ ] provides a district court with authority that is independent of 18 U.S.C. § 981[,] . . . a court may not enter an order that violates § 981(g)(6)—that is, an order that would destroy a property's value or that would harm the rights of persons with an interest in the property— because if it did, that same court would have to issue a new order that undid the violating order." Id. In other words, "an order for interlocutory sale of property subject to a stayed civil forfeiture proceeding must be made consistent both with the requirements of Rule G(7) and with obligations imposed by § 981(g)(6)." Id.

## B. Legal Standard Under Federal Rule Civil Procedure ("Fed. R. Civ. P.") 24

Under Fed. R. Civ. P. 24(a), a putative intervener of right must establish four criteria: "the applicant must (1) file a timely motion; (2) claim an interest relating to the property or transaction that is the subject of the action; (3) be so situated that without intervention the disposition of the action may impair that interest; and (4) show that the interest is not already adequately represented by existing parties." Butler, Fitzgerald & Potter v. Sequa Corp., 250 F.3d 171, 176 (2d Cir. 2001). "Failure to satisfy any one of these requirements is a sufficient ground to deny the application." Security Pacific Mortg. and Real Estate Servs., Inc. v. Republic of

_Philippines_, 962 F.2d 204, 208 (2d Cir. 1992) (quoting _Farmland Dairies v. Comm'r of N.Y._

_Dep't of Agriculture_, 847 F.2d 1038, 1043 (2d Cir.1988)).

For a party to intervene in a case as of right under Rule 24(a)(2), that party must have an

interest in the case that is "'direct, substantial, and legally protectable.'" _United States v._

_Peoples Benefit Life Ins. Co._, 271 F.3d 411, 415 (2d Cir. 2001) (quoting _Washington Elec._

_Coop., Inc. v. Mass. Mun. Wholesale Elec. Co._, 922 F.2d 92, 97 (2d Cir. 1990)).  According to

the Second Circuit, "[a]n interest that is remote from the subject matter of the proceeding, or that

is contingent upon the occurrence of a sequence of events before it becomes colorable, will not

satisfy the rule."  _Washington Elec._, 922 F.2d at 97.

Intervention may also be granted on a permissive basis under Fed. R. Civ. P. 24(b).  Rule

24(b) provides in part:

> On timely motion, the court may permit anyone to intervene who:
> . . . (B) has a claim or defense that shares with the main action a
> common question of law or fact. . . . In exercising its discretion the
> court must consider whether the intervention will unduly delay or
> prejudice the adjudication of the original parties' rights.

Permissive intervention is thus within the court's broad discretion.  _Diversified Group, Inc. v._

_Daugerdas_, 217 F.R.D. 152, 157 (S.D.N.Y. 2003); _see_ _U.S. Postal Service v. Brennan_, 579 F.2d

188, 192 (2d Cir.1978).  In exercising that discretion, courts consider factors that include "'the

nature and extent of the intervenors' interests,' the degree to which those interests are

'adequately represented by other parties,' and 'whether parties seeking intervention will

significantly contribute to [the] full development of the underlying factual issues in the suit and

to the just and equitable adjudication of the legal questions presented.'"  _Id._ (quoting _H.L._

_Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc._, 797 F.2d 85, 89 (2d Cir.1986)).  It is

notable that "[t]he test is flexible and courts generally look at all of the factors rather than

focusing narrowly on any one of the criteria." <u>Mass. Bricklayers and Mason Funds v. Deutsche Alt–A Secs.</u>, 273 F.R.D. 363, 365 (E.D.N.Y. 2011).

In considering a motion to intervene, the court must accept as true non-conclusory allegations of the motion. <u>Oneida Indian Nation of Wisc. v. New York</u>, 732 F.2d 261, 265 (2d Cir.1984); Sackman v. Liggett Group, Inc., 167 F.R.D. 6, 20 (E.D.N.Y.1996). Allegations that are frivolous on their face need not be considered by the court. Bay Casino, LLC v. M/V Royal Empress, 199 F.R.D. 464, 466 (E.D.N.Y.1999). In addition, "an application to intervene cannot be resolved by reference to the ultimate merits of the claims which the intervenor wishes to assert following intervention...." Brennan v. N.Y.C. Bd. of Educ., 260 F.3d 123, 129 (2d Cir.2001). The putative intervenor has the burden of showing a right to intervene. In re NASDAQ Market–Makers Antitrust Litig., 187 F.R.D. 465, 490 (S.D.N.Y.1998); Diduck v. Kaszycki & Sons *71 Contractors, Inc., 149 F.R.D. 55, 58 (S.D.N.Y.1993).

Finally, Rule 24(c) specifies the procedures to be followed when a party seeks intervention:

> Procedure. A person desiring to intervene shall serve a motion to intervene upon the parties as provided in Rule 5. The motion shall state the grounds therefor and shall be accompanied by a pleading setting forth the claim or defense for which intervention is sought. The same procedure shall be followed when a statute of the United States gives a right to intervene.

Fed. R. Civ. P. 24(c).

## C. As to the Government's Motion for Interlocutory Sale of the Montauk Property

In this case, the Government argues that interlocutory sale of the Montauk Property is appropriate because Distinctive Ventures has been in default on the CreXus Loan since June 5, 2012. In addition to the $14,598,467.92 that was owing the CreXus Loan as of April 1, 2013, interest continues to accrue at a rate of 17.16% per annum, or $6,184.02 per day, while late fees

accrue in the amount of 5% of the unpaid amounts due and owing with each missed payments. In the Government's view, an interlocutory sale is necessary to prevent the continuing accrual of interest and late charges claimed by CreXus, thereby protecting the equity in the Montauk Property from being further reduced.

For their part, the Distinctive Claimants oppose the Government's motion on the ground that the interlocutory sale proposed by the Government would diminish rather than preserve the value of the Montauk Property. In this regard, the Distinctive Claimants claim that an interlocutory sale is unnecessary pursuant to 18 U.S.C. § 981(g)(6) because (1) the value of the Montauk Property is appreciating; (2) the hotel generates cash flow to cover upkeep and maintenance costs, as well as taxes and insurance; and (3) Distinctive Ventures has maintained the Montauk Property in excellent condition. Further, although the Distinctive Claimants concede the CreXus Loan is in default, they contend that this expense is not excessive relative to the Montauk Property's fair market value. They further contend that the $4 million breakup fee included with the March 2013 LOI far exceeds the yearly interest costs on the CreXus Loan.

In addition, the Distinctive Claimants argue that the requirements of Supplemental Rule G(7) are not met because there is no mortgage on the Montauk Property and the Government has not demonstrated that there is a good cause for the sale. Lastly, the Distinctive Claimants assert that even if the Court concludes that interlocutory sale of the Montauk Property is appropriate, it should nevertheless reject the proposed sale to HFZ-BGS as commercially unreasonable.

At the outset, the Court finds that an interlocutory sale is necessary and appropriate in this case under both 18 U.S.C. § 981(g)(6) and Supplemental Rule G(7). While the Distinctive Claimants attempt to dismiss the default on the CreXus Loan as being unsubstantial compared to the market value of the Montauk Property, the Court cannot ignore the significant amount of

interest accruing daily on the CreXus Loan, which the Court calculates to total approximately $2,201,511.12 per year based on the $6,184.02 daily interest. Consequently, since the CreXus Loan has already been in default for more than a year and half, the Court estimates that the value of the Montauk Property has been diminished by nearly $3.5 million, and it is continuing to lose value.

Instructive here is the court's decision in <u>479 Tamarind Drive</u>, which involved the interlocutory sale of a house that had been appraised at $769,000. 2012 WL 3886698, at *1. The court held that "[a]n interlocutory sale [was] appropriate" because "[m]ore than $40,437.55 in taxes [were] currently due on the defendant property, raising a risk that the County may move to impose a lien and thereby diminish the property's value to the Government should the forfeiture action succeed." <u>Id.</u> at 2.

In reaching its conclusion, the court specifically rejected arguments by a claimant who was in possession of the house that (1) "the value of the defendant property [was] far in excess of the outstanding tax bill" and (2) "if the property [was] foreclosed upon, [the claimant's] interest [would] be depleted before any interest the Government might have." <u>Id.</u> The Court explained that "a civil forfeiture proceeding [ ] is an <u>in rem</u> action premised on the legal fiction that the property proceeded against can be 'held guilty and condemned as though it were conscious instead of inanimate and insentient'" and, as such "entitles the Government to take possession of the defendant property in its entirety." <u>Id.</u> (quoting <u>United States v. Contorinis</u>, 692 F.3d 136, 146 (2d Cir. 2012)). Accordingly, "[b]ecause the Government hope[d] to take full title to the defendant property," the Court reasoned that "any action by tax authorities to encumber the property[would] have a direct impact on the value the Government [could] recover through [the] action." <u>Id.</u>

While the Court recognizes that this case does not involve tax obligations, but rather involves CreXus's lien on the 8,955 Distinctive Shares and related proprietary leases for the unsold apartment units located at the Montauk Property, the Court nevertheless finds that the reasoning from 479 Tamarind Drive is applicable here. The default by Distinctive Ventures on the CreXus Loan and the resulting accruing interest of $6,184.02 a day plus additional late charges will have a serious impact on the value of the Montauk Property to the Government should the Government ultimately succeed in this civil forfeiture action. This, in turn, would affect the amount of money available from which Callahan's alleged victims could recover.

The Court is also unconvinced by the Distinctive Claimants argument that the CreXus Loan is not a mortgage for the purpose of Supplemental Rule G(7)(b)(i)(C) simply because it does not fit within the definition of "mortgage" under New York's Uniform Commercial Code (the "UCC"). Courts in this Circuit have commonly used the term "mortgage" to refer to loans secured by shares in a cooperative that owns real property, such as the CreXus Loan here. See Liu v. Bank of America, 08-CV-3358 (JG), 2010 WL 1702537, at *1 (E.D.N.Y. Apr. 28, 2010) (referencing to the plaintiff's loan secured by her 217 shares in a cooperative apartment building as a "mortgage loan"); BRS Associates, L.P. v. Dansker, 246 B.R. 755, 759 (S.D.N.Y. 2000) (describing, in relevant part, loans "secured by mortgages on . . . cooperative shares").

Moreover, the Distinctive Claimants suggestion that Supplemental Rule G(7)(b)(i)(C) should be limited to loans secured by fee simple title to real property and not include loans secured by shares in a cooperative is counterintuitive. Indeed, such a restrictive reading would prevent courts from preserving the value of a property before a civil forfeiture proceeding was completed simply because ownership of the property in question was established through this alternative method of a cooperative. In any event, even if Supplemental Rule G(7)(b)(i)(C) was

inapplicable, the Court finds that the interlocutory sale could nevertheless proceed under Supplemental Rule G(7)(b)(i)(D), which grants courts the authority to order an interlocutory sale "for good cause." Good cause exists here because "the property is subject to diminution in value" due to the default on the CreXus loan. Supp. R. G(7)(b)(i)(D), Advisory Committee's Notes. For these reasons, the Court also finds that the interlocutory sale is necessary under 18 U.S.C. § 981(g)(6) so as to preserve the value of the Montauk Property should the Government prevail in this civil forfeiture action, particularly for the benefit of Callahan's alleged victims.

To the extent the Distinctive Claimants contend that an interlocutory sale is unnecessary because the Montauk Property is well-maintained, the Court finds their contention to be inapposite. Arguments addressing the condition of the Montauk Property are relevant when considering a motion for an interlocutory sale brought pursuant to Rule G(7)(b)(i)(A) or (B), which concern the authority of courts to order the sale of a property that "is perishable or at risk of deterioration, decay or injury" or when "the expense of keeping the property is excessive or is disproportionate to its fair market value" respectively. However, the Government's motion is brought pursuant to Rule G(7)(b)(i)(C) and (D), neither of which have anything to do with the condition of the property, but rather involve whether the property is losing value due to some other circumstance, such as a default on a mortgage loan, as is the case here.

Nevertheless, although the Court finds that an interlocutory sale of the Montauk Property is necessary and appropriate in this case under Supplemental Rule G(7) and 18 U.S.C. § 981(g)(6), the Court doubts the commercial reasonableness of the sale proposed by the Government and HFZ-BGS. In this regard, HFZ-BGS's $54,150,000 offer falls toward the lower end of the estimated $52 million to $88 million value of the Montauk Property. The Court does not find the purchase price offered by HFZ-BGS to be unreasonable per se, especially in

light of the other similar offers for the Montauk Property that have been made by other interested

parties.  The Court also finds that there is nothing necessarily wrong with including either a

breakup fee and/or a broker's commission with the offer to purchase.  However, in the Court's

view, it is the combination of the lower-end offer with the breakup fee or the broker's

commission that will seriously reduce the potential amount that will be available to repay alleged

defrauded investors in the Callahan Funds once the CreXus Loan and the Gibraltar Loan are

repaid.

Indeed, if the proposed sale to HFZ-BGS went to closing, after the debts to CreXus and

Gibraltar were satisfied and the broker's commission was paid, only approximately $36 million

would be available to pay back the loans from the Callahan Funds.   Further, if HFZ-BGS was

outbid by an offer of at least 110% of HFZ-BGS's offer – that is, $59,565,000 – the alleged

victims of Callahan's fraudulent scheme would only receive $38 million from the proceeds of the

sale of the Montauk Property once the CreXus Loan, the Gibraltar Loan and the breakup fee

were paid.  Therefore, the Court rejects the Government and HFZ-BGS's proposed sale and

permits them to file a revised proposal for the sale of the Montauk Property within thirty days of

the date of this Order.

As a final matter, pursuant to 18 U.S.C. § 981(g)(6), the Court grants the Government's

request for an order directing the Distinctive Claimants to produce an accounting of revenue and

expenses associated with the Montauk Property and to tender all excess income to the United

States Marshals Service.  The Court agrees with the Government that in light of the substantial

surplus that the Co-Op and Distinctive Ventures potentially have, it is necessary to ensure that

any excess funds are being used toward paying off the CreXus debt and are neither siphoned off

or dissipated.

**D. As to Latus's Letter Motion to Intervene in this Civil Forfeiture Proceeding**

The Court first notes that Latus's letter motion is procedurally improper, as it violates the Individual Motion Practices of this Court, which prohibits letter motions. Individual Mot. Practices of Judge Arthur Spatt Rule IV(B) ("No letter motions will be accepted."). Nevertheless, "this Court has discretion to consider documents filed in violation of procedural rules." Church & Dwight Co. v. Kaloti Enters. of Mich., L.L.C., 07 Civ. 0612(BMC), 2011 WL 4529605, at *1 n.1 (E.D.N.Y. Sept. 27, 2011) (citation and internal quotation marks omitted). Therefore, the Court will consider Latus's motion.

Latus seeks to intervene in this action, but makes no attempt at showing that it is entitled to intervene. Indeed, although it bears the burden, Latus has not demonstrated that it has satisfied any of the requirements for intervention as of right under Fed. R. Civ. P. 24(a) or permissive intervention under Fed. R. Civ. P. 24(b). See Erdman Technologies Corp. v. US Spring Commnc'ns Co., L.P., 91 CIV. 7602 (PKL), 1997 WL 401669, at *2 (S.D.N.Y. July 16, 1997) (holding that "brief and vague allegations fall well short of satisfying either the Rule 24(a) standard for intervention as of right or the more lenient Rule 24(b) standard for permissive intervention"). In fact, Latus does not even identify its grounds for intervening as required by Fed. R. Civ. P. 24(c) and "[t]his deficiency alone [is] sufficient to deny the motion." Id.; see also Boyd v. J.E. Robert Co., 05-CV-2455 KAM RER, 2010 WL 5772892, at *15 (E.D.N.Y. Mar. 31, 2010), report and recommendation adopted by 2011 WL 477547 (E.D.N.Y. Feb. 2, 2011). Thus, under these circumstances, the Court denies Latus's letter motion to intervene.

**III. CONCLUSION**

For the foregoing reasons, it is hereby

**ORDERED,** that an interlocutory sale of the Montauk property is both appropriate and necessary in this case pursuant to 18 U.S.C. § 981(g)(6) and Supplemental Rule G(7); and it is further

**ORDERED,** that because the Court finds that the Government and HFZ-BGS's sale is commercially unreasonable, the Court denies the Government's motion without prejudice and permits the Government and HFZ-BGS to submit a revised proposal for the sale of the Montauk Property within thirty days of the date of this Order; and it is further

**ORDERED**, that the Distinctive Claimants are directed to produce an accounting of revenue and expenses associated with the Montauk Property within thirty days of the date of this Order and to tender all excess income to the United States Marshals Service; and it is further

**ORDERED**, that the letter motion by Latus seeking to intervene in this civil forfeiture action is denied.

**SO ORDERED.**

Dated: Central Islip, New York
        February 22, 2014                                    _____/s/ Arthur D. Spatt_____
                                                                        ARTHUR D. SPATT
                                                                  United States District Judge